IN THE COURT OF APPEALS OF TENNESSEE

AT KNOXVILLE

Assigned On Briefs January 23, 2015

**IN RE: NOAH B.B.**

**Direct Appeal from the Chancery Court for Hamilton County**
**No. 13A012      W. Frank Brown, III, Chancellor**

_____

**No. E2014-01676-COA-R3-PT-FILED-MARCH 12, 2015**

_____

This appeal involves the termination of a Mother's parental rights on the grounds of abandonment by willful failure to visit and willful failure to support.  We affirm the trial court's finding that grounds for termination exist due to abandonment by willful failure to visit, and we also affirm the trial court's finding that termination is in the best interest of the child.  We vacate the trial court's finding of abandonment by willful failure to support but otherwise affirm the order terminating Mother's parental rights as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in part, Reversed in part, and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Leah L. Granger, Hixson, Tennessee, for the appellant, Amy S.

Charles W. Wheland, III, Chattanooga, Tennessee, for the appellees, James B. and Kristi B.

**OPINION**

**I.   FACTS & PROCEDURAL HISTORY**

Noah B. was born in July 2010.  His parents, James B. ("Father") and Amy S. ("Mother"), were married at the time.  In early February 2011, when Noah was a few months old, Father and Mother were involved in a domestic dispute.  The argument

centered on Mother's prescribed medications, which, at the time, included Xanax, Adderall, and either hydrocodone or Percocet. Mother accused Father of hiding or taking her medications, and she ultimately struck Father in the head. The police were called, and Mother was criminally charged with domestic assault and resisting arrest. Due to another incident that occurred days later, Mother was also criminally charged with harassment. Father and Mother separated, and Mother moved to Chickamauga, Georgia to reside with her mother, stepfather, and sister.

On February 22, 2011, an ex parte order of protection was entered by the Circuit Court of Hamilton County, Tennessee, which prohibited Mother from coming about or contacting Father or Noah. An agreed supplemental order was entered regarding visitation, which provided that Father would have temporary primary residential custody of Noah, and Mother would have supervised visitation two days per week, with the visitation to be supervised at all times by Noah's grandparents. Communication between Mother and Father was to occur through Noah's maternal grandfather, who would also transport Noah to and from visitation. The agreed order provided that Mother's visitation would begin when she "produces documentation to the petitioner from her treating licensed physician stating that she is currently receiving treatment and is able to properly care for the minor child during her visitation." Mother did not produce such documentation, and consequently, she had no visitation with Noah from March to June 2011. However, during that time, Mother was charged with six additional counts of harassment, stalking, and violating the order of protection.

In July 2011, a second agreed order was entered, providing that the ex parte order of protection would remain in full force and effect. The order provided that Mother would have supervised visitation with Noah from 8 a.m. to 6 p.m. on Saturdays and Sundays, under the supervision of Mother's mother.[1] In accordance with this order, Mother had one supervised visit with Noah on a Saturday in July 2011, around Noah's first birthday, but she failed to return Noah to Father at the designated time that evening. Instead, Mother took Noah to the police station in an attempt to have Father charged with child abuse due to unexplained bruising. Noah was returned to Father, and no criminal charges were filed. However, Child Protective Services ("CPS") became involved and investigated Father's home. CPS determined that Father's home was safe and that Noah was not in imminent danger. After extensive testing, doctors determined that Noah bruises easily due to an iron deficiency. CPS recommended that Mother's supervised visits take place at the office of the Tennessee Department of Children's Services ("DCS"). Mother had two supervised visits at the DCS office in late July. These were Mother's last visits with Noah.

---

[1]The order of protection case was consolidated with the parties' pending divorce case.

Mother and Father were divorced by decree in August 2011. Both parties were represented by counsel. Father was named primary residential parent of Noah. The parties agreed to a parenting plan that provided several "phases" of supervised visitation for Mother. First, she would complete a phase of supervised visitation with Noah, one hour per week, at the local DCS office. If Mother received approval from DCS, she would begin the second phase of supervised visitation, which would include daytime visits on Saturdays and Sundays under the supervision of Mother's mother. If this supervised visitation was successful for a period of three and a half months, and Mother also completed a full mental health evaluation and avoided any violations of the order of protection, she would be permitted overnight weekend visitation with Noah, but only under the supervision of the maternal grandmother.

Despite these provisions, Mother did not have any further visits with Noah after the entry of the divorce decree. DCS informed Mother and Father that it was closing its file and would not supervise visitation. DCS referred Mother and Father to "Four Points," a center in Lafayette, Georgia that specialized in supervised visits, but Mother never contacted the center to arrange the visitation.

Father began a relationship with Kristi B. ("Stepmother") sometime around September 2011. Mother was charged with an additional count of harassment in November 2011. At a hearing on the order of protection in January 2012, Father announced in open court an oral notice of voluntary dismissal. Therefore, the court entered an order of dismissal of the petition for order of protection on January 30, 2012. All of the criminal charges against Mother had previously been "bound over" without a hearing. On February 22, 2012, all of the criminal charges were dismissed, with the exception of the most recent harassment charge, because no one appeared to prosecute the charges.

Noah turned two in July 2012; he had not seen Mother since July 2011. A hearing on child support was held in October 2012. Mother failed to appear, but she was ordered to pay child support of $286 per month. Father and Stepmother married in December 2012. The final harassment charge against Mother was dismissed in March 2013.

On April 15, 2013, Father and Stepmother filed a petition for adoption, seeking to terminate Mother's parental rights in order to enable Stepmother to adopt Noah.[2] When the petition was filed, Mother had not visited Noah for roughly twenty-one months, and she had never paid child support to Father. As a result, the petition sought termination of Mother's parental rights on the ground of abandonment by willful failure to visit and willful failure to support, pursuant to Tennessee Code Annotated section 36-1-113(g)(1) and 36-1-102(1)(A)(i). The petition also alleged that it was in Noah's best interest for Mother's parental rights to be terminated and for the adoption petition to be granted.

Mother filed an answer to the petition and denied that she abandoned Noah. She claimed that Father's "activities" prevented her from seeing Noah. The trial court appointed a guardian ad litem for the child. After Mother's attorney withdrew due to illness, she submitted a uniform civil affidavit of indigency, and the trial court appointed counsel for Mother for the remainder of the proceedings.

The trial court conducted a bench trial on July 30, 2014, during which it heard from five witnesses and received nineteen exhibits. After taking the matter under advisement, the trial court entered a written order terminating Mother's parental rights on August 8, 2014. For reasons that will be discussed in detail below, the trial court found by clear and convincing evidence that Mother willfully failed to visit Noah and willfully failed to support him during the relevant timeframe and, therefore, grounds for termination existed due to willful abandonment. *See* Tenn. Code Ann. § 36-1-113(g)(1). The trial court also found by clear and convincing evidence that termination of Mother's parental rights was in Noah's best interest. Accordingly, the trial court terminated Mother's parental rights and designated its order as final pursuant to Tennessee Rule of Civil Procedure 54.02. Stepmother's petition for adoption apparently remains pending. Mother timely filed a notice of appeal to this Court.

## II. ISSUES PRESENTED

Mother presents the following issues, as restated, for review on appeal:

---

[2]The petition states that Father joined in the petition for the express purpose of giving his consent to the adoption. "[A] parent has no standing to petition for the termination of the other parent's parental rights but is a necessary party to the petition for adoption by a step-parent." *In re Kaiden T.*, No. M2014-00423-COA-R3-PT, 2014 WL 7149215, at *1 n.3 (Tenn. Ct. App. Dec. 15, 2014) (citing *In re Adoption of Z.J.D.,* No. M2012-01596-COA-R3-PT, 2013 WL 870654, at *1 n.1 (Tenn. Ct. App. Mar. 7, 2013)). Stepmother has standing to petition for termination of Mother's parental rights as a prospective adoptive parent. *See* Tenn. Code Ann. § 36-1-113(b)(1).

1.      Whether the trial court erred in finding clear and convincing evidence of the ground of abandonment; and

2.      Whether the trial court erred in finding by clear and convincing evidence that termination was in the child's best interest.

Father and Stepmother raise an issue regarding whether this appeal is frivolous, entitling them to an award of attorney's fees. For the following reasons, we affirm the decision of the chancery court as modified and remand for further proceedings. We decline to award attorney's fees on appeal.

### III. STANDARDS FOR REVIEWING TERMINATION CASES

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.*, 254 S.W.3d at 437. A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights. *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010); *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Audrey S.*, 182 S.W.3d at 860. In

light of the constitutional dimension of the rights at stake in a termination proceeding, the person seeking to terminate these rights must prove all the elements of the case by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). In sum, in order to terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination, but also that termination is in the child's best interest. *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013); *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

Because of this heightened burden of proof in parental termination cases, on appeal we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings *de novo* in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) amount to clear and convincing evidence that one of the statutory grounds for termination exists. *Id.* at 639-40. Whether a statutory ground has been proven by the requisite standard of evidence is a question of law to be reviewed *de novo* with no presumption of correctness. *In re R.L.F.*, 278 S.W.3d 305, 312 (Tenn. Ct. App. 2008) (citing *In re B.T.*, No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn. Ct. App. Jan. 31, 2008)).

## IV. DISCUSSION

### A. Grounds for Termination – Abandonment

The first ground for termination listed in the termination statute, and the one on which most cases rely, is abandonment. *In re Audrey S.*, 182 S.W.3d at 862. For purposes of terminating parental rights, there are five alternative definitions of abandonment listed in Tennessee Code Annotated section 36-1-102(1)(A)(i)-(v). Pursuant to the first definition, which is the one relevant to this case, "abandonment" means that:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the [] parent or parents or a guardian or guardians of the child who is the subject

of the petition for termination of parental rights or adoption, that the []
parent or parents or a guardian or guardians either have willfully failed to
visit or have willfully failed to support or have willfully failed to make
reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). Abandonment can be established by showing that
a parent either willfully failed to visit or willfully failed to support the child during the
relevant time period. *In re Christopher M.*, No. W2010-01410-COA-R3-PT, 2010 WL
4273822, at *10 (Tenn. Ct. App. Nov. 1, 2010) (citing *In re Adoption of McCrone*, No.
W2001-02795-COA-R3-CV, 2003 WL 21729434, at *10 (Tenn. Ct. App. July 21,
2003)).

The willful failure to visit, support, or make reasonable payments toward the
support of the child must have occurred in the four months immediately preceding the
filing of the termination petition currently before the court. *In re D.L.B.*, 118 S.W.3d
360, 366 (Tenn. 2003). Here, Mother indisputably did not visit Noah or pay child
support during the relevant four month period. The pivotal issue on appeal regarding
Mother's failure to visit and failure to pay child support is whether her actions were
willful. "The requirement that the failure to visit or support be 'willful' is both a
statutory and a constitutional requirement." *In re Adoption of Kleshinski*, No. M2004-
00986-COA-R3-CV, 2005 WL 1046796, at *18 (Tenn. Ct. App. May 4, 2005).
Therefore, the element of willfulness is essential and central to the determination of
abandonment. *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); *In re C.M.C.*,
No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *6 (Tenn. Ct. App. Aug. 3, 2005).
Willfulness in the context of termination proceedings does not require the same standard
of culpability as is required by the penal code, nor does it require that the parent acted
with malice or ill will. *In re Audrey S.*, 182 S.W.3d at 863; *see also In re S.M.*, 149
S.W.3d 632, 642 (Tenn. Ct. App. 2004). Rather, a parent's conduct must have been
willful in the sense that it consisted of intentional or voluntary acts, or failures to act,
rather than accidental or inadvertent acts. *In re Audrey S.*, 182 S.W.3d at 863.

Willfulness of a parent's conduct depends on the parent's intent, and intent is
seldom capable of direct proof. *In re Audrey S.*, 182 S.W.3d at 864 (citing *In re Adoption
of S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 WL 2804892, at *8 (Tenn. Ct. App.
Dec. 6, 2004)). Triers-of-fact lack the ability to peer into a person's mind to assess
intentions or motivations and must infer intent from circumstantial evidence, including
the parent's actions or conduct. *Id.* Because testimony may be critical to the
determination of whether a parent's conduct was willful, trial courts are best situated to
make a determination of willfulness. *In re D.L.B.*, 118 S.W.3d at 367. The question of

intent or willfulness depends on the totality of the circumstances, and the facts must be applied to the standard definition of willfulness. *V.D. v. N.M.B.*, No. M2003-00186-COA-R3-CV, 2004 WL 1732323, at *6 (Tenn. Ct. App. July 26, 2004). "To prove the ground of abandonment, a petitioner must establish by clear and convincing evidence that a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d at 640. "Clear and convincing evidence" has been defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id.* (citing *In re Valentine*, 79 S.W.3d 532, 546 (Tenn. 2002)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Audrey S.*, 182 S.W.3d at 861. "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). This Court reviews questions of law *de novo* with no presumption of correctness. *Id.*

## 1. Willful Failure to Visit

Mother admitted at trial that she did not visit Noah during the four month period prior to the filing of the termination petition in April 2013. In fact, when the petition was filed, she had not seen Noah for approximately twenty-one months. Mother last visited Noah in July 2011, on or around his first birthday, prior to the entry of the final decree of divorce. However, Mother argued before the trial court, and continues to assert on appeal, that her lack of contact with Noah "was not willful in nature" and was "due to the actions of [Father]." Specifically, Mother points to the ex parte order of protection that was entered against her in February 2011, and she also claims that she was arrested multiple times "due to the actions of [Father]." Mother claims that these "artificial barriers" to visitation preclude a finding that her actions were willful. We respectfully disagree.

The record contains surprisingly little evidence regarding most of Mother's arrests. After the domestic incident between Mother and Father on February 9, 2011, Mother was charged with domestic assault and resisting arrest. Father testified that when Mother was released from jail, she called and threatened him, stating that she had someone watching his mother's house and describing events that had taken place at the home. Mother was charged with harassment on February 20, 2011. The ex parte order of protection was entered against Mother on February 22, 2011, but the circuit court also ruled that a supplemental order would be entered to address contact between Mother and Noah and contact between Mother and Father concerning Noah. The agreed

supplemental order, entered April 3, 2011, *nunc pro tunc* to March 7, 2011, provided Mother with supervised visitation two days per week, to be supervised by Noah's grandparents. The agreed order provided that Mother could communicate with Father through the maternal grandfather regarding the supervised visitation and for information regarding Noah. During April 2011, Mother was charged with six separate counts of either stalking, harassment, or violating the order of protection. Mother was charged with another count of domestic harassment in November 2011. The record before us does not contain any details regarding the incidents giving rise to these charges. At trial, Mother's attorney simply asked Mother, "Every time that you tried to contact [Father] to see Noah, was there another arrest warrant issued?" Mother responded, "Yes. Yes, there was." Mother claimed that Father "would just take out orders of protection again or he would just go file warrants against me." However, the agreed order clearly provided that communication between the parents would only take place through the maternal grandfather. Mother agreed to this limitation on communication between the parties, and it is not surprising that Father sought to enforce it, given the domestic dispute between the parties. The trial court concluded that "[t]he problem of being arrested was one of [Mother's] own making." The evidence does not preponderate against this finding.

The March 7, 2011 agreed supplemental order also provided that Mother's supervised visitation would begin when she produced documentation from her treating licensed physician stating that she was currently receiving treatment and able to properly care for the child during visitation. On appeal, Mother seems to argue that this requirement presented another barrier to her visitation. Mother had no visitation between March and June 2011 because she failed to produce the required documentation.[3] However, Mother cannot now complain about the fact that she was required to produce documentation that she was receiving treatment and able to care for the child when Mother agreed to this condition precedent in the agreed supplemental order. Moreover, the agreed supplemental order was superseded by subsequent orders and was no longer applicable during the relevant four month period.

During the four month timeframe at issue, the parties were subject to the agreed permanent parenting plan that was entered in August 2011. The parenting plan was signed by Mother, Father, and their respective attorneys. As previously noted, the first phase of supervised visitation would take place at DCS for one hour per week. The second phase would include daytime visits under the supervision of the maternal grandmother. If this phase was successful for three and a half months, and Mother also

---

[3]Father testified that Mother attempted to produce documentation from her gynecologist, but such documentation was not sufficient to meet the requirement of the agreed order. Mother also attempted to obtain documentation from a behavioral health center, but the physician who met with Mother provided a letter stating that he did not provide the type of service or evaluation Mother requested.

completed a full mental health evaluation and avoided any violations of the order of protection, the third phase would include overnight weekend visitation with Noah under the supervision of the maternal grandmother. After the divorce, DCS informed the parties that it was closing its file and would not supervise visitation. However, DCS referred the parties to Four Points, a specialized center in Lafayette, Georgia that would provide supervision for visitation. DCS records indicate that the parties' case manager provided their information to Four Points on or before August 31, 2011. Father was not opposed to supervised visitation at Four Points. He testified at trial that when Noah's supervised visits did not begin after entry of the divorce decree, he eventually became concerned about Noah's lack of contact with Mother and contacted Four Points himself to ask if he could do anything "to help set this thing up." Father was told that he could not and that Mother had to set up the visitation. Father asked why the visitation had been delayed, and he was told that Mother had not contacted Four Points to arrange visitation. Father contacted Four Points a second time after "a very long period of time" elapsed, and he was again told "the same story."

Father testified that even after the order of protection was dismissed on January 30, 2012, Mother never contacted him about setting up supervised visitation in accordance with the parenting plan. Nearly all of the criminal charges against Mother were dismissed on February 22, 2012. On February 25, 2012, Father sent a text message to Mother's mother, stating:

> This message is for [Mother]. I would like to know if [Mother] intends to set up visitation with Four Points in LaFeyette [sic]. She has to be the one to set it up initially. If the fees are a problem then perhaps we can work something out.

It is not clear from the record whether Mother responded to this message, but it is undisputed that she did not contact Four Points regarding visitation.[4] Father also testified that Mother never provided him with evidence that she had obtained a mental evaluation, which would have been required under the parenting plan prior to any overnight supervised visitation with Noah. Nevertheless, Father insisted that he never prevented Mother from seeing Noah. Stepmother similarly testified that Mother had not attempted to see Noah.

---

[4]Father testified that his next contact with Mother occurred in May 2012 when she left some messages for him. Stepmother testified that these calls were received at 5:00 A.M. one morning, and they were not answered because she assumed that it was the wrong number. However, no one testified about the content of these messages.

Mother admitted that she had not visited Noah in nearly two years. She added,

> [a]nd the reason I haven't seen him is because when you've been arrested six or seven times and you don't have any more money for – any more bond money or money for attorneys or anything, you become a little bit gun-shy. You don't want to -- you want your son with you, but my gosh, at what cost? Like if I knew -- if I just -- what am I going to do, show up at [Father's] house and him have me arrested again? And that's after I just got all of these charges dismissed. So that's why I didn't take that chance.

Mother admitted that she was aware that the order of protection was dismissed in January 2012 and that she was in court when the criminal charges against her were dismissed in February 2012. She admitted that she never filed a petition or motion with the divorce court to enforce the current visitation schedule or to modify it. She said she never returned to court to "revisit" the parenting plan because she did not have legal representation. However, the record shows that the same attorney who represented Mother during the 2011 divorce proceedings represented Mother during the initial phases of this termination proceeding, filed in 2013, until he became ill. Mother clearly knew how to retain an attorney to represent her when she needed assistance.

The trial court found that Mother had not visited Noah since July 2011 and concluded that her failure to visit was willful. The trial court expressly noted Mother's claim that she did not try to see Noah because of her recent arrests. However, the trial court found that "[t]he problem of being arrested was one of [Mother's] own making." The trial court also found that "[Mother's] defense is not persuasive as she never went to the divorce court to get more parenting time or to enforce the time she was initially provided," and she "never filed any petition for contempt against [Father] based upon her allegations that he was denying her visitation with Noah." The court found that Mother did nothing "to establish supervised visitation at Four Points, Inc." and did not obtain the mental evaluation required by the parenting plan.

We likewise conclude that Mother's failure to visit was willful. We recognize that "[a] parent cannot be said to have abandoned a child when his failure to visit [] is due to circumstances outside his control." *In re Adoption of Angela E.*, 402 S.W.3d at 640. The Tennessee Supreme Court has recognized that "when a parent attempts to visit his child but is 'thwarted by the acts of others,' the failure to visit is not willful." *In re M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009) (quoting *In re Adoption of A.M.H.,* 215 S.W.3d 793, 810 (Tenn. 2007)). However, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute

11

a significant restraint or interference with the parent's attempts to visit the child." *Id.* at 393, (citing *In re Audrey S.*, 182 S.W.3d at 864). Here, Mother agreed to the limitations imposed on her visitation, including the requirement of supervision and the required mental evaluation. These limitations did not constitute "a significant restraint or interference" with Mother's attempts to visit Noah. *See id.* Mother simply failed to take the steps necessary to meet these requirements. She never even contacted the facility that could provide supervised visitation, and she did not comply with the parenting plan's requirement that she complete a mental evaluation. Mother did not provide any reasonable explanation for her failure to complete these steps.[5] Father attempted to arrange visitation at Four Points and offered the possibility of financial assistance to Mother, if necessary. However, the ultimate responsibility fell to Mother. Mother's history of arrests does not excuse her failure to visit. The order of protection prevented Mother from contacting Father directly, but she was permitted to contact Father through Noah's maternal grandfather or grandmother, and Mother does not suggest that she was unable to do so. Even when the order of protection was dissolved and the criminal charges against Mother were dismissed, Mother did not try to see Noah. At any point, Mother could have filed a court petition seeking visitation, but she failed to do so even when twenty-one months passed since she had seen her son.

This Court has emphasized that "visitation is not a rote statutory requirement; it is necessary to maintain the thread of the parent-child relationship[.]" *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *16 (Tenn. Ct. App. June 16, 2011). An absence of contact between a parent and child for an extended period of time can lead to, in effect, the death of the relationship. *Id.* This is particularly true for a child as young as Noah, who was four years old at the time of trial and had not seen Mother since his first birthday.

The record before us contains clear and convincing evidence that Mother had the capacity to visit Noah, she made no attempt to do so, and she had no justifiable excuse for not doing so. *See In re Adoption of Angela E.*, 402 S.W.3d at 640. We therefore affirm the trial court's finding that grounds existed for terminating Mother's parental rights based on abandonment by willful failure to visit Noah for a period of four consecutive months preceding the filing of the termination petition.

---

[5]We note Mother's testimony at trial that she did have a mental health evaluation around "the end of last year," but according to Mother's estimation, this evaluation would have been completed months after the petition for termination was filed, and furthermore, Mother admitted that she never provided the evaluation to Father, to the court, or to anyone else.

Even though the termination statute only requires the finding of one ground to justify terminating parental rights, our supreme court has instructed the court of appeals to review the trial court's findings of fact and conclusions of law as to each ground for termination asserted, in order to further the policies of permanently placing children, reaching just and speedy resolutions of cases, and preventing unnecessary remands of cases heard by the supreme court. *In re Angela E.*, 303 S.W.3d at 251 n.14. Therefore, we will proceed to consider the other grounds for termination found by the trial court.

## 2. Willful Failure to Support

A party seeking termination of parental rights on the ground of abandonment by willful failure to support "must prove by clear and convincing evidence that the opposing party had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *In re Adoption of Angela E.*, 402 S.W.3d at 641. Willful failure to support or to make reasonable payments toward support means "the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). A finding that support was "insignificant" in light of the parent's "means" must be based on evidence regarding both the parent's actual financial support of his or her child and the parent's "means." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *11 (Tenn. Ct. App. Jun. 3, 2003). "In the context of token support, the word 'means' connotes both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d at 641 (citing *In re Z.J.S.*, 2003 WL 21266854, at *11 n.24; *Black's Law Dictionary* 1070 (9th ed. 2009)). "The definition of token support itself requires consideration of the circumstances of the individual case." *In re K.C.*, No. M2005-00633-COA-R3-PT, 2005 WL 2453877, at *9 (Tenn. Ct. App. Oct. 4, 2005) (citing Tenn. Code Ann. § 36-1-102(1)(B)).

Mother admitted that she did not pay child support during the four months preceding the filing of the termination petition. However, the evidence regarding Mother's capacity to pay support is quite sparse. The final decree of divorce did not resolve the issue of child support, and Mother did not appear at the October 2012 post-divorce hearing to set Mother's child support obligation. At that time, the court based Mother's child support obligation on an "ability to earn [an] average gross monthly income of $1256.67." Mother's current child support obligation was set at $259 per month. The relevant four-month period spans from December 15, 2012, to April 14, 2013. When testifying regarding Mother's history of taking pain medication, Father briefly mentioned that she worked as a CNA in the past and injured her back in early

13

2000. However, he did not mention any other details regarding Mother's employment history. Mother testified that she graduated from high school and had "a little bit of college" education, and she said she was physically healthy. At the time of trial, Mother was unemployed and "trying to find a job." She said her criminal charges served as a barrier to finding employment because potential employers discovered her criminal history when they ran a background check. Mother testified that her last job was the previous summer (almost a year earlier, while the termination case was pending, and not within the relevant four-month period), when she worked part-time at a learning center until she was no longer needed.

Mother testified that she had considered going back to school to complete her nursing degree, and when she applied for a school loan, "they said it was there for me to come take it." However, she did not mention when this occurred or why she had not pursued that opportunity. Mother testified that if she regained custody or visitation with Noah, she would provide for him by "getting employment." She said she had recently inquired at a career center about jobs. At the conclusion of Mother's testimony, the trial judge asked Mother if she was working between mid-December 2012 and mid-June 2013, presumably in reference to the timeframe that would be relevant to the abandonment analysis. Mother simply responded, "Yes." However, there was no mention of where she worked during that period, whether she worked during the entire time period, how many hours she worked, how much income she earned, or what expenses Mother owed at that time.

In *In re Adoption of Angela E.*, 402 S.W.3d at 641, the Tennessee Supreme Court found that petitioners failed to provide clear and convincing evidence of willful failure to support when there was no evidence presented concerning the defendant-father's monthly expenses, even though it was undisputed that he was earning an annual income of $150,000 and owned lien-free property worth at least $300,000. In *Angela E.*, the Tennessee Supreme Court specifically held that, in order to prove the ground of abandonment for failure to support, "a party seeking termination of parental rights must prove by clear and convincing evidence that the [parent who failed to support] had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *Id*. at 641. "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable … and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. 2005).

The evidence regarding Mother's capacity to pay child support in this case is far more limited and far less convincing than the evidence presented in *Angela E.* The

14

burden to prove Mother's abandonment by willful failure to support rests squarely on the petitioners. However, the record before us does not indicate that the petitioners submitted clear and convincing evidence of Mother's willful failure to support. In fact, the record before us does not indicate that the petitioners submitted clear and convincing evidence of Mother's capacity to provide support or that she lacked a justifiable excuse for failing to provide support. Petitioners did not submit sufficient evidence of Mother's employment status during the relevant four-month period, the number of hours she worked, the duration of her employment, her rate of pay, or whether Mother had assets other than regular income that might contribute to the support of the child. The record contains no evidence regarding Mother's financial means, expenses, or obligations during the relevant four month period. Without this basic information, we are unable to determine, by clear and convincing evidence, whether Mother had the capacity to provide support. It is not enough for a petitioner to "simply prove that Mother was not disabled during the relevant timeframe" and therefore assume that she was capable of working and paying child support. *In re Josephine E.M.C.*, 2014 WL 1515485 at *18 (Tenn.Ct.App. 2014). Rather, petitioners must also present clear and convincing evidence to establish that she had no justifiable reason for not providing support to the child, which evidence might include Mother's assets and/or expenses. In the case before us, petitioners simply failed to present sufficient evidence to "eliminate any serious or substantial doubt" about whether Mother's failure to support the child was indeed willful.

Finding no clear and convincing evidence that Mother had the capacity to pay child support during the relevant four month period, we vacate the trial court's finding of abandonment for willful failure to support. However, because a ground for termination exists due to Mother's willful failure to visit Noah, we proceed with the best interest analysis.

## B. Best Interest

The parental termination statute requires a finding by clear and convincing evidence that termination of parental rights is in the child's best interest. The best interest of a child must be determined from the child's perspective and not the parent's. *In re Arteria H.*, 326 S.W.3d 167, 182 (Tenn. Ct. App. 2010), *overruled on other grounds* (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)). Tennessee Code Annotated section 36-1-113(i) provides a list of factors that are relevant when deciding what is in a child's best interest. However, the list is not exhaustive. In addition, "the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest." *In re Arteria H.*, 326 S.W.3d at 182.

We find that the evidence in this case clearly and convincingly supports the trial court's finding that termination is in Noah's best interest. Noah was four years old at the time of trial. He last saw Mother around his first birthday. He met Stepmother when he was one year old, and since that time, Stepmother has functioned as his mother. Stepmother testified that Noah "depends on me as his mom" and "doesn't know any different." She said he had been calling her "mommy" for about two years, and "it just kind of happened" when he heard other children using that term. Stepmother said Noah does not understand that she is not his actual mother, and she did not see the point in telling him otherwise and confusing him when Mother is not involved in his life. There was no evidence presented at trial to suggest that Mother sent birthday cards or letters to Noah or maintained any type of contact with him in the past three years. According to Stepmother, Noah "does not know [Mother] at all." The trial court found that Stepmother had been Noah's mother "for all practical purposes" since late 2011, that Noah had "no recollection" of Mother, and that there was "no meaningful relationship" between Noah and Mother. The evidence clearly supports these conclusions. The trial court also found that "[i]t would be a major, traumatic event for Noah" to be introduced to Mother and required to visit with her after he has believed for at least two years that Stepmother is his mother. We agree with the trial court's observation that Mother's current attempt to assert her parental rights, when faced with a termination petition, has come "too late."

The trial court was also concerned about Mother's mental health, as she had been diagnosed with anxiety and depression and had a history of taking numerous medications for these conditions. However, at the time of trial, Mother testified that she had not been taking her medication for about two months. In addition, Mother had paid child support to Father only twice, both of which were paid after the termination petition was filed. These facts also suggest that terminating Mother's parental rights is in Noah's best interest.

In sum, the statutory best interest factors weigh heavily in favor of terminating Mother's parental rights. Mother has not "maintained regular visitation or other contact with the child," Tenn. Code Ann. § 36-1-113(i)(3); no "meaningful relationship" has been established between the parent and the child, Tenn. Code Ann. § 36-1-113(i)(4); and changing the child's caretaker and physical environment would likely have a negative impact on his emotional and psychological condition, Tenn. Code Ann. § 36-1-113(i)(5). Mother's unresolved mental health issues are concerning. Tenn. Code Ann. § 36-1-113(i)(8) (requiring consideration of the parent's mental and/or emotional status). In addition, she has not financially supported Noah over the years. Tenn. Code Ann. § 36-1-113(i)(9) (instructing courts to consider whether the parent has paid child support). We affirm the trial court's finding that Noah's best interest would best be served by terminating Mother's parental rights.

### C. Attorney's Fees

Father and Stepmother sought an award of attorney's fees on appeal, claiming that Mother's appeal was frivolous. Determining whether a parent's rights to his or her child should be terminated "is the most serious and grave issue to be addressed by this Court," and consequently, "we are loathe to consider an appeal of a trial court's judgment terminating a parent's rights to be frivolous." *In re M.L.D.*, 182 S.W.3d at 898. In this case, we have ruled in favor of Mother on one issue and do not consider the appeal frivolous. The request for attorney's fees is therefore denied.

### V. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed as modified. Costs of this appeal are taxed to the appellant, Amy S., for which execution may issue if necessary.

_____

BRANDON O. GIBSON, JUDGE